## CARL DALTON v. STATE.

No. A-9450.   April 28, 1939.
(90 P. 2d 40.)

J. L. Gowdy and Joe Adwon, both of Oklahoma City, for plaintiff in error.

Mac. Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for the State.

DAVENPORT, J. By information Carl Dalton, the defendant in the trial court, was charged with robbery with firearms after a former conviction of a felony, was convicted and sentenced to the state penitentiary for life. A motion for new trial was filed, considered, overruled, and defendant appeals.

William D. Hirschi, testifying on behalf of the state, stated:

"I live at Guthrie, Oklahoma. In 1932 I was county attorney of Logan county, Okla. I have seen the defendant before. In 1932, I had him up on a charge of robbery with firearms. In that case the defendant Carl Dalton pleaded guilty on the 3rd of December, 1932. Judge Freeman Miller was district judge at the time, and defendant Carl Dalton was sentenced to ten years in the penitentiary at McAlester, and was delivered to the penitentiary by the sheriff."

Carl Morgan, testifying for the state, stated that he was court clerk of Logan county, Okla.; that he had in his possession and under his custody the files and records of the county clerk's office. There was an information filed in the case, No. 1260, State of Oklahoma v. Carl Dalton, charging the defendant with a felony. The case was finally disposed of in the form of a judgment and sentence.

"I have the original judgment and sentence with me. The return of the sheriff shows that the defendant was delivered to the penitentiary. I was clerk two years while Freeman Miller was district judge."

H. B. Rickard, testifying for the state, stated:

"I live in Oklahoma City, Okla. I have lived here for 22 years. I live on Grand Boulevard and Robinson, north. I work for the Oklahoma Publishing Company; have been working for it for 20 years. I am married. My family consists of a wife and two children, one four and one-half years old and the other two. My house sets back off the roadway about 100 yards. I recall May 30, 1937, which was Decoration Day. That morning we drove out to my mother's farm, which is three miles west of Wheatland. Bill Frederick went with us. We returned home that day about 10 or 15 minutes of 1 o'clock in the afternoon. When we got back home, I parked the car in my driveway. There are five big rooms in our house. I did not have a key to the front door, and I went to the back door, and put my little girl through the window, and she opened the door from the inside. The window through which I put my little girl is in the west part of the house. The little girl opened the door and let me in. When I walked into the kitchen, I stopped at the water bucket to get me a drink; then she ran through into the living room, then she ran through into the big sitting room. I looked and saw her come running with her hands up, and I bent down and picked her up. The door from the kitchen enters the living room from the west side. It does not extend all the way across the house. When I reached down to pick up the little girl, and started back, I got shot through my hip (indicating). I saw the person who shot me. When I reached up and turned around and looked, he was behind my back. We were in the west room, immediately

north of the kitchen. It would be west of the door through which I was entering the sitting room from the kitchen and to my left. The person that shot me is now in the courtroom (pointing the defendant out who was sitting on the opposite side of the table in the courtroom). I did not know him prior to that date. I owned a gun and had left it in the dresser drawer of my bedroom that day."

A gun was handed to the witness, and he identified it as being his gun that he had left in the dresser drawer in his room when he went to visit his mother.

"The nick in the handle was not there when I left it in the dresser drawer. After the shot was fired I hollered, 'My God, What is going on here?' and he said something, and that is when I first noticed him. I had my little girl in my arms and made a run to my bedroom, as I was scared, and he was behind me, and he said, 'Lay down or I will kill you.' I did not want to get hurt, and did not want her to get hurt. I wanted to hide her, that was my intention in going to the bedroom. I laid down and defendant had the gun to my back, standing up over me. The defendant turned around and went back in the living room. I could not see where he walked to after he went out of the sitting room. I heard him going through the house with my wife, talking to her. He came through the door and told my wife to lie down. She stood there a minute or two, and I said, 'Honey, lie down or he will hurt you.' He had the gun towards her stomach. I do not know just where my wife went when I first got out of the car. My little boy was out with my wife. He is a little more than two years old. My wife lay down on the floor, and the little boy came in from the kitchen and jumped in between us on the floor. The hired hand was out getting one of the cows that had gotten out and was putting her back in the lot. Mr. Frederick, the hired hand, came running into the big sitting room which is immediately west of the bedroom in which me and my wife and children were. The defendant was outside. After the defendant made my wife lay down on the floor, he went out and came back in the house, put the gun to my temple, and said, 'Let me have your car keys or I will blow your brains out,' and I said, 'They are in my hip pocket,' and he said, 'Get them.' I reached back and got them out of my hip pocket. I took my time and unfolded the keys and pulled

out the right key, and said, 'Here is the key to it.' He then ran out through the back part of the house; that is, he started that way. He did not come back in the house any more where my wife and the children were. I heard the car leave. We were in the house at the time the car was driven away. After the car left Mr. Frederick went to a telephone. After that I went to St. Anthony's Hospital. I was there from 2 Sunday until Wednesday evening about 5 o'clock. I saw the man that shot me at St. Anthony's Hospital. He was brought there. The envelope has pennies, nickels, and one or two dimes, and a lot of mills, and some kind of coin the kids got out of a box of Cracker Jacks—some kind of an advertisement, I would call it. They belong to my little girl.

"Exhibit '5' is a bottle of perfume that belonged to my little girl."

"Exhibit '6' is a .410 shotgun shell. I have got a .410 gun, and I had the shells in the room when I left that morning. These shells were gone when I came back from the hospital. I looked for these shells."

"The bullet that was fired into me, went on out. I did not see the bullet in the house, nor do I know who picked it up. The officers brought the man to the hospital that I identified, and he is here in the courtroom, and is the same man that I identified as being the man that shot me."

On cross-examination the witness testified to substantially the same as in his original testimony. Going into detail as to the description of the house in which he was living, where he was shot, the things that were taken from the house and afterwards recovered by the officers from the defendant.

On redirect-examination the witness testified as to what he had paid for the car that was stolen from his driveway after the defendant shot him. Witness further said that his furniture was all torn up, that an $85 sewing machine was busted to pieces.

"It was locked when we left that morning. A lot of stuff was thrown on the floor, and we had a divan that he started to cut up. There was three cushions that goes on

the divan, and he had taken a knife and ripped the corners open."

On further recross-examination the witness was questioned by the defendant's counsel as to a claw hammer that was in the house, and the witness stated that he did not scuffle with the defendant for the hammer, nor did he get the hammer and start to strike the defendant. Witness further stated that he did not run into the bedroom and get the gun.

A map or plat showing the house in which the trouble occurred was examined.

Mrs. H. B. Rickard stated:

"My name is Mrs. H. B. Rickard. On May 30, 1937, we went down to my husband's mother's place, out by Wheatland. We returned home around 1. In the car was my husband, myself, the two children, and Mr. Frederick. When we first got home, we put the little girl in the window to open the door, and I went into the house, and laid some meat on the table, and got the slop bucket and went out to empty it. Just stepped into the kitchen and right out. My little boy was on the porch, and as I passed out, I met my husband coming in the house. As I came back into the house, I heard my little girl say, 'Daddy, how come all the drawers pulled out?'; then I heard a gun shot. I could not tell whether it was in the room ahead of me or somewhere ahead of me in the house. I could not see my husband at the time I heard the shot. When I heard the gun shot, I went to see what was wrong. As I went into the kitchen, there I met this colored man coming, pointing a gun at me. The colored man that pointed the gun at me is in the court room, this man right here (indicating). He said, 'Are you going to do what I tell you to do?' To the best of my knowledge I said, 'I don't know anything else to do,' and he said, 'Get in there,' and pointed to the bedroom, and I must have gone in, though I could remember no conscious effort of moving, and next I found myself in the room and my husband lying on the floor and my little girl lying down beside him. This defendant kept telling me to lay down and I started to lie down. He was holding the gun pointed at me all the time. As he turned, the back of his head was impressed upon me

almost as much as his face had been. He was dressed in dark trousers and blue shirt. I did not remember much about his hat. I remember about his face, because I saw his face, nose, and eyes, and lips. He afterwards came back, and pointed the gun at my husband, and said, 'Did I hurt you?', and my husband said, 'I think you did.' And he pointed the gun at my husband, and it seemed to me he moved it closer to him, and against his temple, and he said, 'Give me those keys or I will blow your brains out,' and my husband said, 'They are——,' and he seemed to be thinking, then he said, 'No, they are in my pocket,' and he reached in his pocket and got them out, and gave him the key that opened the switch. The last time I saw him during the trouble was when he walked out of the rear of the house. Just after he got the key and started out, I heard a shot. I saw Mr. Frederick at the house after my husband was shot. We were in the bedroom on the floor when Mr. Frederick came in. After we heard the car start, my husband rose up, and that is when I saw the blood, and became very much excited and started to do something for him and did not know what to do, and kept asking him, and the first thing he had Mr. Frederick go to the telephone—we did not have one in the house—and call the ambulance and the law. I went out to the road and a car was coming by and I stopped it. I took those people up to the house. They took me to a telephone, and I called the ambulance first, and then called the law. And the officers came out. When the officers came out, I gave them a description of the man that had shot my husband. Afterwards I saw the man. This man sitting right here (indicating). The officers brought him to the house. My husband had a gun. There was a piece broken out of it; some one picked it up off the floor. The piece fits in where the broken piece is gone. The perfume belonged to my little girl. She had had it for quite a while. I have the box with me in which it was when it was brought to the house. The box and perfume was in the house that morning when we left. This green sweater, marked state's exhibit '10,' after the shooting I found it in the kitchen. That was the first time I had seen it, and it does not belong to any of my family."

The witness identified the pennies and other things in the bag as belonging to her daughter. The bag con-

tained pennies, dimes, nickels, and tokens out of a Cracker Jack box.

"When we returned the furniture was torn up. My machine was locked when I left, and when I got back all the drawers had been poured out, and the locks broken out. My cedar chest was also locked when we left, and the locks had been broken out, and all the front of the cedar chest boards had been broken loose. The furniture was disarranged. The divan has one cushion that had a three-cornered hole cut in it that wasn't there before. We found a car crank, a big long piece of iron, and also crooked, and had been outside in the yard there. We had a hunting knife that belonged to my husband, and kept it in the dresser drawer in the bedroom, and when I found it the next day I found it in the bedroom, and it had some pieces of curtain that had been jerked down wrapped around it."

On cross-examination the witness stated that William Frederick was the name of the man that had worked for them.

"He had been with us off and on—not steady— for about four years. When he started in, he milked, and one year he farmed for my husband, and took care of the stock, and the little things about the place. Mr. Frederick was not working for us at the time of this trouble. He had been working for us. He was boarding with us and working for another fellow on the place, too, and was working for us to take care of things—just working for his board and taking care of things. My husband drove on the driveway on the west side of the house."

Several pages are taken up in examination and cross-examination as to the description of the house, its arrangements, and where the car was parked, which lengthens the record, but is wholly immaterial for the reason that there is no question about the defendant being in the house, and the only defense attempted to be made is self-defense.

"The day after the shooting, I saw the gun and perfume. Mr. Riggs and Mr. Geter are the officers that brought the defendant to the house after they had arrested him."

William F. Frederick, testifying for the state, stated:

"On the 30th day of May, 1937, I was living at Mustang, but up at Mr. Rickard's that day. I went with Mr. Rickard and his family to see his mother at Wheatland, Okla. About 1:00 o'clock in the afternoon we returned to Mr. Rickard's home. When we drove in to the house, one of the cows was out on the Boulevard, and I went and got her, and put her in the lot. In the meantime I heard some shots, and the people scream, and hurried the cow into the lot, and came back into the house, and stepped on the porch and went right by the defendant, this colored man, on the porch that leads into the kitchen. He came out the door and stuck a gun in my face. He snapped the trigger, and the gun did not go off, and of course I dodged him, to one side, and he pulled a second time, and that one did not go off, and I got up my courage and went up towards him to the side, and he backed up when I went into the house. He shot through the window at me—that was in the kitchen—I found Mr. Rickard and his family in the bedroom on the floor. I saw Mr. Rickard was bleeding, and this fellow came around the house and started on the front porch, and Mr. Rickard told me to lie down. I did for a minute, but got up when I heard him start the car. He drove away in Mr. Rickard's car. I then went up the back way to a telephone and in the meantime, Mrs. Rickard came up in a car and she beat me to a telephone, and the ambulance and the officers came. I directed them to the house. Afterwards that day, I saw the man that did the shooting. The officers brought him back by the house. The man across there is the man that did the shooting and the man the officers brought back by the house. He is the same man that shot at me through the window. I found the bullet in the living room that he shot at me. The one shown me looked like the same one. I gave it to Mr. Eads the officer."

On cross-examination the witness stated that he had known Mr. Rickard off and on since 1933.

"About the 30th of May, 1937, I went to work for him for a few days. I was not working for him on the date of this trouble. I met Mr. Rickard at the Santa Fe Depot on Saturday evening before this Sunday of the trouble, and went home with him and spent the night.

It was not very long after I left the car until I heard the first shot."

C. E. Riggs, testifying for the state, stated:

"My name is C. E. Riggs, detective of the Police Department, Oklahoma City. I am a detective with the Police Department. I was working in that capacity on May 30, 1937. We were called on to go out to Grand Boulevard and North Robinson street in the country, to investigate an alleged shooting. Paul Geter was with me. When we got out to the house we talked with Mr. Rickard; we learned there had been a shooting, and the person who did it had gotten away in an automobile. We were given a description of the person who did the shooting. After we got a description from Mr. Rickard, we left the scene of the shooting and went east on Grand Boulevard. We went down to Sixteenth and Twenty-Third, and over to Grand Boulevard, and went around Grand Boulevard, and came through Hassman, a good place to hide, and searched Hassman out, and went out on the east side of Hassman and into Brown street, east of the Fair Grounds, and turned south to the right, and saw a colored man going up the road, north down Brown street, and we got even with him, I stopped him. We could see the description was all right, and when he stopped we could see some heavy object in his left front pocket, and see also because it did not sway, and the end of the gun was sticking out of his pocket. We searched him and took the gun off him. The pistol marked as state's exhibit '3' is the pistol I took out of his left hand trouser's pocket, this defendant sitting here. We took eight or nine .410 shotgun shells, plain bore, green colored shells out of his pockets. The envelope marked state's exhibit '6' are the shells that we took from this defendant. The gun had one bullet in it. Had no empty shells. We found a little bottle of perfume, I took out of his left hip pocket. State's exhibit '5' is the bottle of perfume that I took from this defendant, and gave to Bill Eads. The envelope which has been identified as state's exhibit '4' and which contains a number of objects, as money and pennies, $1.71, and some odd pieces. I believe they were in his right hip pocket, anyway we took them from the defendant."

State's exhibit "12" was identified by the witness as a bullet which he picked up in the middle of the room

**118**

where Mr. Rickard was shot, and which he had marked at the time so that he could identify it.

"We took the defendant to St. Anthony's Hospital, where Mr. Rickard was, and he identified the pistol that they had taken from the negro as belonging to him, and which was taken from his home at the time of the shooting."

On cross-examination the testimony of the witness in substance is the same as his direct examination.

W. I. Eads, testifying for the state, stated:

"I live in Oklahoma City. I am a deputy sheriff of Oklahoma county. I was called to make an investigation into the shooting of Mr. Rickard on May 30, 1937. And I went out to his home on Grand Boulevard and North Robinson. While there I was given a pellet marked state's exhibit '11', by Mr. Frederick. This is a pellet apparently from a .410 caliber gun. It is in the same condition it was when Mr. Frederick handed it to me."

The foregoing is in substance the testimony of the state.

Mrs. Tillie Vanek, testifying on behalf of the defendant, stated:

"My name is Tillie Vanek. I live in Oklahoma City. My husband and I are in the Fur Company at 113 N. Hudson. My home is 733 N. E. 11th Street. I know the defendant. Have known him since about Christmas. He has been working for me at the house and at the store. We handle fur at the store, and he works also at the house. I found him to be honest and truthful, the best fellow we ever had."

J. S. Vanek, in substance, testified to the same facts that Mrs. Tillie Vanek testified to, stating that the defendant had worked for them and that he made a satisfactory hand.

Carl Dalton, the defendant, testifying in his own behalf, stated:

"My name is Carl Dalton. I am 34 years old. I was born in Oklahoma, and have lived here all my life. From

the time after I was big enough to rack balls, I worked at Bert Emmit's Billiard Parlor and the Empire Billiard Parlor. In 1929 I was charged and convicted in Logan county, and sentenced to ten years. That was in the late part of 1932. I got out Christmas of the past year. I was given a parole; since I returned from the penitentiary I have been working for Mr. and Mrs. Vanek who were in the fur business. I remember what happened to me about May 30, of this year. Well, on the night before the 30th, on Saturday, it was a rainy night, and a boy friend and myself, Fred Polk, went down on Second street in the 300 block, and we stayed there until about 9:30. He said, 'I believe I will go home.' I went to the Southern Hotel, right off California and Broadway to see about a regular job. The fellow I went to see was Lem Ragland, and so he was not there. He wasn't on duty. The fellow on duty said to go to the Jefferson Hotel first. It sets just across the street, and in going over there, the porter I met on the inside, it was raining, and he came out. His name was Harry McKeith, and I told him they sent me about seeing about a job. And Mr. Rickard came out. Mr. Rickard asked me if I was working at the hotel, and I told him I was looking for a job, and he asked me if I wanted a regular job, and I told him I did, and he told me to come to his house the following day, which was Sunday, Decoration Day. He gave me the location; and said he was working for the Oklahoma News or some publishing company, and that he could possibly give me a regular job, as he was doing a little farm work on his place. After meeting Mr. Rickard, I came out to his house the next day, just walking, and I left California and Broadway, and went up on the East Side just to visit Otis Spear and Ervin Williams, and came back over on Second street, and went to Curtis Parker's, and that has a beer garden. I do not know the address, and went in and drank a couple of bottles of beer. I engaged in a dice game, just about $3 or $4, and kind of in the back or in fact across the alley on First street, and stayed there until real early in the morning. I do not know what time. About 10:00 or 9:30 Sunday morning, something like that time. After I left there I went home and it was early in the morning, real early on Sunday morning, and lay down for a while, and got up and dressed and left about eight o'clock. I live at 725 Northeast Second Street. And instead of going up

Lindsey Street, I met a boy I had been out with, and he had just bought a little Ford Pickup—a green truck. Otis spear is his name, and he wanted me to go with him. I walked out to Mr. Rickard's place. I went up on the front porch and knocked on the front door and there was some little dog in the yard, and I hesitated for some little time, wondering whether it would bite, and I went around to the west side of the house to the back door, and came back from the back door, it seems to have been latched, and I walked back around by the west side of the house and the window was ajar, and I went in the window, and as I went in, one door, or the latch that catches back of the ice box was open. I got a drink of water and set down in a chair, and when I realized the presence of any other person, it was a little girl coming in the window or being lifted in a window. I did not see the one lifting her, but she did not evidently see me. She went to the door, it seemed to be a little latch, a wooden latch, and opened it, and a lady came in, and her first words were, 'Who left the ice box open?', and she went back out of the house. I did not see her. I saw her, too, and she did not see me in the other room, and not seeing Mr. Rickard, I got up to speak to her, and said, 'I am here to see Mr. Rickard,' and by that time Mr. Rickard came in the door, and came up in the middle of the room and almost as close to me as that bar there, and looking at me in a half bewildered way, and not recognizing me, and I said, 'Mr. Rickard,' and when I said that he just reached and got the hammer that he had right on the ice box, and we were scuffling over the hammer. The adjoining room was in front of where he first got the hammer, just a door adjoining the two rooms, we started scuffling over the hammer, and the door is not very far or very close, no more than five or six steps, if I remember, and when I jerked him loose from the hammer, after we scuffled over the hammer for so long a time, and the force of me pulling him and facing the door—it was next to the bedroom, and he just reached in there and got the pistol, and I would have run if I had had a chance, and there was nothing to do but grab Mr. Rickard—protect myself as best I could, and while Mr. Rickard was engaged in scuffling, Mr. Rickard was shot. After Mr. Rickard got shot, I do not remember how many times the pistol was fired, but I remember the pistol was fired before Mr. Rickard was shot and after he was shot.

He stopped for a little and dropped down on his knees, and I said, 'I guess you are shot,' and he said, 'I believe I am shot,' and so I started out and met this other fellow coming up by the side of the house, and he saw me. I had the gun in my hand, and because of that he showed his fright. I went to the east side of the house and back by the west side of the house, and passed the car and turned around and came back and saw the key in the car, I jumped in the car and backed the car out, and went east on the highway that leads to the Capitol, and around the Capitol and out there somewhere. I did not know the directions or anything, and ran the car in the ditch, and started walking, and went to a colored settlement. I inquired the way to town and after I had gone about a quarter of a mile, the officers were coming down the street, and I saw the car a long distance away, and they asked me if I had seen a colored boy driving a black car, and I had not seen any, and I said 'No,' and he asked 'What's that you have in your pocket?', and I said, 'It is a gun and a bottle of whisky.' There was a bottle. I had taken a little whisky—a pint bottle one-eighth full. The officer said, 'Give me the gun,' and I gave it to him. He took the gun, and whisky, the pennies, and shells, all of which were in my possession, and put me in the car and took me out to Mr. Rickard's house and drove in and one stayed with me while the other went in the house to talk with Mrs. Rickard. And after being in there some time, they come out on the porch and identified me, and then they left and started towards town. I won those pennies in a dice game. I did not take them from Mr. Rickard's house. I did not hold a gun on Mr. Rickard and make him give me his car key."

On cross-examination the defendant stated he was born in Oklahoma 34 years ago. "I worked first at the Empire Pool Hall," then stated the number of parties he had worked for during his life, and admitted that he was charged in Logan county with robbery with firearms in 1932; that he used a revolver in that crime in Logan county. He admitted that he, by using a gun, took a Chevrolet automobile from a woman in Logan county, and afterwards went to the penitentiary for 10 years for the crime.

Defendant further stated that he was on parole at the time that the offense for which he was now being tried

was alleged to have been committed. The little girl was assisted through the window of Mr. Rickard's home and unlatched the back door. She went through the room ahead of her father, and she turned around and came back towards her father as he came into the room. William Frederick started to come into the house as he passed out. .

"I met him on the back porch as he was going out of the kitchen door. I had the pistol when the officers stopped me, in my britches pocket. I left the car in the ditch where I stuck it. I left the key in the car. I don't remember saying to Mr. Riggs that he had me. I had the pistol. There was a nick out of the butt, out of it, and it is the pistol I took from the Rickard home."

On redirect-examination he stated that the reason he took the pistol away with him was because he was excited, and was afraid he would be killed, and "he would have killed me, if he had had his hands on the gun, and it was through a stage of fright that I went out of the door with the gun in my hand, and when I met the fellow out there and he saw the gun in my hands, and started running, and passed down by the automobile, and in the excitement I ran back and jumped in the car. I took the car to get away. I was excited knowing that I had shot Mr. Rickard, and that he had been shot in the scuffle."

The defendant has assigned 10 errors alleged to have been committed by the trial court, but in his brief he argues only the first and tenth assignment of error; his first assignment being that the court was in error in overruling the demurrer to the information, for the reason that the information attempted to charge a second offense without stating in the information the exact punishment received at the prior conviction; and the tenth assignment being, the defendant was denied a fair and impartial trial by the inflammatory and highly prejudicial remarks by the county attorney in arguing the case to the jury. The jury was very severe in assessing the punishment to the defendant as stated by them in the Oklahoma News due to the pardon and parole system in Oklahoma.

In his brief the defendant states:

"This appeal is based on purely a legal and technical question. The principles of law adopted by the decision in this case will have a far reaching effect in the interpretation of criminal laws and the statutes in this state in the future."

That part of the information complained of by the defendant is in part as follows:

"And have been committed by the said defendant as above set out after having been convicted of the crime of robbery with firearms on the 3rd day of December, 1932, in Logan county, state of Oklahoma, before the district court sitting in and for said county and state, by district court number 1260, and said former conviction of robbery with firearms being a crime punishable by imprisonment in the state penitentiary."

To this part of the information, supra, the defendant filed a demurrer which is as follows: "Comes now the defendant and demurs to the information for the following reason, to wit: the information attempts to charge robbery with firearms after a former conviction of a felony, and in the body of the information the charge further reads as follows:". The allegation complained of is set out in this opinion, and it will not be necessary to restate it here.

As is shown by the record the defendant was tried under the provisions of section 1817, O. S. 1931, Okla. Stat. Ann., title 21, section 51.

The defendant's contention is that the information as to the prior conviction was not sufficient to charge the defendant under the said section, and insists that a strict rule of interpretation should be applied to the statutes that provide for a greater punishment than is ordinarily imposed for the commission of an offense.

To sustain his contention that the information did not sufficiently plead the former conviction by showing the punishment inflicted upon the defendant in Logan coun-

ty, the defendant cites Johnston v. State, 46 Okla. Cr. 431, 287 P. 1068, 1069, being a case where the party was charged with the violation of the prohibitory liquor laws, wherein the court held:

"The district court had jurisdiction of the charge only in the event that there had been a previous conviction of a violation of the liquor law. To give the court jurisdiction, it was necessary that the former conviction be definitely alleged and proven. It was one of the essential allegations, and it was as necessary to prove it as to prove the possession charged."

Under the statute where one has been convicted of a violation of the prohibitory liquor laws of the state, and he is charged a second time by pleading the conviction properly, it makes the second offense a felony and gives the district court jurisdiction to try the case.

The demurrer raises only the question that the amount of time given said defendant by the judgment and sentence of the court in Logan county was not plead in the information.

Counsel for the defendant cites many cases which he insists sustain his contention that the information is bad for the reason that it does not allege in the information that when the prior conviction was had, the information should state the length of time the defendant was sent to the penitentiary. That the defendant was convicted and sent to the penitentiary is not disputed. In fact, the defendant himself, on the witness stand, admitted the conviction and sentence, and that he served a time in the penitentiary and was out on parole at the time this crime is alleged to have been committed.

After careful reading of the authorities cited by the defendant in his brief, and studying and considering the information, we hold that the demurrer of the defendant to the information was properly overruled, and that the information charging prior conviction was a felony and

that the proof upon that question is amply sufficient to warrant the jury in returning a verdict that the defendant had been convicted prior to the offense for which he was being tried by it in this case.

The state in its brief cites many authorities to sustain the proposition that the demurrer of the defendant was not well taken. It is needless to prolong this opinion for the reason that the facts in this case show conclusively that the defendant in this case had been convicted on a charge of robbery with firearms in the district court of Logan county, Okla., and had been sentenced to the penitentiary, served a while, and had been paroled at the time the alleged offense for which he is being tried was committed.

The statements of the defendant that he had met the prosecuting witness on Saturday evening before he committed the crime the following Sunday, and that he went to the prosecuting witness's home, and found no one at home, and that he found a window open, and went in the house, and sat down in a chair to wait until the family returned, is unreasonable, unbelievable, and shows on its face, not only that the defendant is willing to commit crime after crime, but that his statement is an absolute falsehood. No jury will believe that any negro man will go to a strange home, go in through the window, or even the door, when the family is not there, and sit down to wait until they come on the pretense of seeing the man of the house, and trying to secure a job.

The record in this case discloses a high-handed robbery attempted by the defendant, and that when the family returned to the home, he was engaged in committing the robbery, and when the prosecuting witness followed his little girl into the room where she turned and ran back to him, the defendant was not satisfied with the crime of burglary he was committing, but was willing to take the life of the prosecuting witness by shooting him with his

own gun. Not being satisfied with that, he made the husband and wife lie down on the floor, and as the man who was living with them came in around the building, to come in as the defendant was leaving the house, he fired a shot at him. Then when he got to the car of the prosecuting witness and found the key was not there, the record shows he came back to the house, and demanded the key of the prosecuting witness, who was lying on the floor, bleeding from the wound that had been inflicted upon him by a shot fired by the defendant into his body. It shows further, then, that he took the key, stole the prosecuting witness's car, and drove away. Later he was apprehended by the officers, and had on his person the pistol of the prosecuting witness which he had stolen from his house, and with which he had shot the prosecuting witness. He also had a bottle of perfume, a sack of pennies, dimes, nickels, and other tokens, all of which he had taken from the prosecuting witness's home with him after he had shot the prosecuting witness. The proof shows that he had abandoned the car when he had run it into the sand or ditch, and could not get it out.

This is one of the cases where the evil of parole when extended to a thief who commits robbery with firearms is shown. Had this defendant not been paroled, this crime would not have been committed.

No one who carefully reads and studies the record can believe the statement of the defendant that when the prosecuting witness came into his home and saw the defendant there, he picked up a claw hammer and started to hit him with the hammer, and they scuffled over the hammer, and got near the door, and then the prosecuting witness got hold of his gun, and in the scuffle the gun was discharged, and the prosecuting witness was shot. This story is purely willful and malicious perjury, and so willfully made that it is a great wonder that the jury was as lenient with the defendant as it was. Considering the facts as disclosed by the record in this case, the jury was extremely

lenient, and the defendant fortunate that the jury did not give him the death penalty.

The law-abiding citizens in this state are entitled to have their homes protected when at home or when they are away from home, and our state cannot neglect to rigidly enforce the laws against those who commit crimes like the one in this case. There is not a single mitigating circumstance shown.

This court after carefully considering the record in this case does not feel that it would be justified in modifying the sentence imposed upon the defendant.

The defendant was accorded a fair and impartial trial. The court correctly advised the jury as to the law applicable to the facts. There are no errors in the record to justify the court to either reverse the case or to modify the sentence imposed.

The judgment is affirmed.

DOYLE, P. J., and BAREFOOT, J., concur.